**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*8:03 am, Mar 06, 2026*
**JEFFREY P. COLWELL, CLERK**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

**STEPHEN P. GUTIERREZ,**

Plaintiff,

v.                                             Case No. _____

**IBM CORPORATION,**

**Defendant.**

## JURY TRIAL DEMANDED

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### A. PLAINTIFF INFORMATION

Stephen P. Gutierrez

PO Box 520

Hartsel, CO 80449

Telephone: 440-454-3170

Email: stevepg82@gmail.com

Plaintiff appears *pro se.*

### B. DEFENDANT(S) INFORMATION

**Defendant 1:**

IBM Corporation

1 New Orchard Road

Armonk, NY 10504

*Registered Agent for Service in Colorado:*

C T Corporation System

7700 East Arapahoe Road, Suite 220

Centennial, CO 80112

## C. JURISDICTION

This Court has jurisdiction over Plaintiff's claims under the following statutes:

**[X] Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. §§ 2000e, *et seq.* (employment discrimination on the basis of national origin; retaliation for protected activity)

**[X] Age Discrimination in Employment Act**, as amended, 29 U.S.C. §§ 621, *et seq.* (employment discrimination on the basis of age)

**[X] Other:** Equal Pay Act, 29 U.S.C. § 206(d) (sex-based wage discrimination); Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) (failure to comply with mandatory OWBPA disclosure requirements)

## D. STATEMENT OF CLAIMS

*See additional pages attached and labeled "D. STATEMENT OF CLAIMS."*

## D. STATEMENT OF CLAIMS

### *PRELIMINARY STATEMENT*

1. This is an action for employment discrimination arising from the termination of Plaintiff Stephen P. Gutierrez ("Plaintiff") by Defendant IBM Corporation ("IBM" or "Defendant") on March 18, 2025. Plaintiff was a 42-year-old Integrated Service Manager employed in IT Service Management ("ITSM") Governance within IBM's Infrastructure Cloud division.

2. Plaintiff brings five claims: (1) retaliation in violation of Title VII and the Equal Pay Act; (2) age discrimination in violation of the ADEA; (3) violation of the Older Workers Benefit Protection Act; (4) sex-based wage discrimination in violation of the Equal Pay Act; and (5) national origin discrimination in violation of Title VII.

3. These claims arise from a common pattern of conduct: as part of a restructuring of its Infrastructure Cloud division, IBM eliminated all three domestic workers over age 40 from its ITSM Governance team, replaced them with multiple younger workers including workers of Indian national origin based in India, and retaliated against Plaintiff when he exercised his statutory right to seek pay equity. Plaintiff's single ITSM Governance position was not eliminated; it was distributed among at least three replacement workers, none of whom could individually replicate Plaintiff's full scope of responsibilities.

### *STATEMENT OF FACTS COMMON TO ALL CLAIMS*

### *Plaintiff's Employment and Qualifications*

4. Plaintiff was employed by IBM from April 2021 (initially as a contractor through Collabera, converted to full-time employee in January 2022) through April 17, 2025 (his last day of employment, following termination notice on March 18, 2025). At the time of hire, Plaintiff held no academic degrees. During his IBM employment, Plaintiff completed a Bachelor of Science degree (2023) and a Master of Science in Information Technology Management (2024), both from Western Governors University. Plaintiff held the role of Integrated Service Manager for ITSM Governance within IBM's Infrastructure Cloud division. IBM's internal systems additionally assigned Plaintiff two concurrent roles: Site Reliability Engineering Professional (designated as Primary Job Role) and L3 Support Engineer. Plaintiff was originally hired by Marie Puckett, who served as his functional supervisor on the ITSM Governance team. In or around 2023, due to attrition within the ITSM Governance department, Plaintiff's reporting was transferred to manager Josh Miller. Plaintiff managed the Change Advisory Board ("CAB") for Infrastructure Cloud "Classic" and subsequently for the merged VPC environment. Plaintiff also served as the backup for Federal CAB duties performed by Marie Puckett – duties that required U.S. residency to perform. See Exhibit L.

5. Plaintiff holds a Bachelor of Science in Business Administration, Information Technology Management (2023) and a Master of Science in Information Technology Management (2024), along with extensive professional credentials, including: thirteen IBM Digital Credentials (three in Artificial Intelligence); thirteen IT Certifications obtained prior to IBM employment; IBM YourLearning Gold status for two consecutive years (top 95th percentile of all IBM learners); IBM YourLearning Silver status in 2024; and selection for and graduation from IBM's STAR Leadership program (nominated by Marie Puckett).

6. Plaintiff consistently received positive performance evaluations. On February 10, 2025, Plaintiff's most recent evaluation rated him as "thriving." On March 17, 2025 – one day before his termination notice – IBM processed Plaintiff's annual Growth Driven Profit-sharing ("GDP") payment of $2,500. According to IBM's own GDP notification, the GDP program "returns a portion of IBM's profit back to eligible IBMers" with the payment amount "tied to IBM's business results, specifically year over year revenue and operating cash flow growth, and your contribution to these results." The same GDP notification printed IBM Corporate Policy 117 on its face, IBM's internal policy prohibiting compensation discrimination on the basis of sex, national origin, age, and other protected characteristics. See Exhibits G, C.

7. According to the sworn declaration of Marie Puckett, Plaintiff performed eight core job duties in his ITSM role. The ITSM Change Management process maintained an approximate 99% Change success rate – a stable metric sustained over several years. See Exhibit F.

### *The Pay Equity Campaign (Protected Activity)*

8. Beginning in May 2024, Plaintiff engaged in protected activity by raising concerns about pay equity through his chain of command. Plaintiff submitted formal written pay equity requests on November 8, 2024, and continued these requests through March 2025. See Exhibit K.

9. Plaintiff's pay equity concerns were shared with IBM leadership, including through a "Closing the Loop" email exchange on March 25, 2025 – seven days after Plaintiff's termination notice – which demonstrated that IBM leadership was aware of Plaintiff's pay equity complaints and had denied them without explanation. See Exhibit D.

### *The Sequential Elimination of Protected-Class Workers*

10. Plaintiff worked within the ITSM Governance team in IBM's Infrastructure Cloud division. Over the course of Plaintiff's employment, the team experienced significant attrition. By late 2023, following internal transfers and departures, the team's remaining members were all over the age of 40: Michael Gardner (over age 50), Plaintiff (age 42 at termination), and Marie Puckett (age 65 at termination). Michael Gardner was the first of these three to be separated, departing in October 2024 due to IBM's "Business Driven

Mobility." Following Gardner's involuntary departure, the team was reduced to just two members – Plaintiff and Puckett – despite no reduction in workload.

11. On March 18, 2025, IBM terminated Plaintiff's employment, citing a "Reduction in Force" combined with a "Talent Footprint" justification – a designation that permanently affects Plaintiff's employment record. This termination occurred exactly one day after IBM processed Plaintiff's GDP profit-sharing payment. Plaintiff's last day of employment was April 17, 2025, following approximately 30 days' notice. See Exhibit M, D.

12. The "Reduction in Force" and "Talent Footprint" justification is contradicted by contemporaneous evidence. When Marie Puckett directly asked her manager Majid Ahmad (referred to in IBM systems as "Majad Ahmad") whether she and Plaintiff should start looking for other jobs – prompted by being informed, without her input, that Praveen Prabhu had been hired and added to their team – Ahmad responded that he was "adding to ITSM, not reducing." This exchange occurred on or about February 18, 2025, the same day Puckett first learned of Prabhu's hiring and the same day IBM began onboarding Prabhu to ITSM Governance responsibilities. See Exhibit F, item 7.

13. Marie Puckett, the last remaining over-40 ITSM Governance team member, was herself terminated by IBM in approximately November 2025, with her last day on or about December 4, 2025. Puckett was 65 years old at the time of her termination. Like Plaintiff, Puckett received approximately 30 days' notice. By December 2025, IBM had eliminated 100% of the over-40 workers from the ITSM Governance team.

### *The Planned Replacement – Before Plaintiff Was Notified*

14. IBM began onboarding Praveen Prabhu (Praveen.G.B@ibm.com) to ITSM Governance responsibilities on or around February 18, 2025 – approximately 28 days before Plaintiff received his termination notice on March 18, 2025. IBM's own internal Slack communications show Marie Puckett meeting with Prabhu for 1.5 hours on February 19, 2025 to provide an overview of change management responsibilities; requesting IBM system access for Prabhu on February 20, 2025; and on February 24, 2025, showing Prabhu how to navigate Plaintiff's own Monday.com task documentation and auto-responses. IBM was training its replacement for Plaintiff's position using Plaintiff's own documentation while Plaintiff remained employed and unaware of his impending termination.

### *The Replacement Pattern*

15. Following Plaintiff's termination notice, IBM distributed his job duties among multiple replacement workers. IBM's own Monday.com project management system documents that on April 4, 2025 – the same date Plaintiff's tasks were formally reassigned – IBM's ITSM Governance task board showed Plaintiff's named responsibilities transferred on a task-by-task basis to Praveen Prabhu and Zaid Shyikh. Transferred tasks included Change

Approvals (Classic and VPC), Japan Tagging, Emergency Changes, weekly Change Advisory Board (CAB) meetings, Tagging CHG Records for Compliance, Post Ptasks, and others. These transfers were executed by Marie Puckett (Marie.Puckett@ibm.com) in IBM's own system. A contemporaneous snapshot of the same Monday.com board captured on March 25, 2025, seven days after Plaintiff's termination notice, shows Plaintiff as the sole or primary assigned owner of each of these tasks, with no reference to Prabhu or Shyikh. See Exhibit N.

16. IBM's replacement of Plaintiff was not a reduction but an expansion of personnel assigned to perform his functions. IBM distributed Plaintiff's single ITSM Governance role among at least three workers: (i) Praveen Prabhu, who IBM's own internal profile identifies as located in Bangalore, India, reporting to IBM's India Software Labs organizational unit, and who is, upon information and belief, of Indian national origin – onboarded to IBM specifically for ITSM in February 2025; (ii) Zaid Shyikh (Zaid.Shyikh@ibm.com), a Site Reliability Engineer based in Austin, Texas, whose IBM ServiceNow profile was updated on March 14, 2025 – four days before Plaintiff's termination notice – and who was added to the "ITSM Governance Approver" group in IBM's ServiceNow system on March 21, 2025, three days after Plaintiff's termination notice (see Exhibit S), specifically because Prabhu was ineligible to perform Federal CAB duties requiring U.S. residency (see Exhibit P); and (iii) Smriti, whose AIOps and Change Management automation role was announced on March 14, 2025, overlapping directly with Plaintiff's Change Management responsibilities. Additionally, Puckett assumed responsibilities that could not be transitioned to replacement workers due to skill gaps. IBM's simultaneous addition of multiple workers to perform the same functions directly contradicts its stated "workforce reduction" rationale. See Exhibits N, P, S.

17. Upon information and belief, all replacement workers – Praveen Prabhu, Zaid Shyikh, and Smriti – are under the age of 40. The sequential elimination of all three over-40 team members (Gardner, Gutierrez, Puckett) and their replacement with younger workers constitutes a pattern of age-based workforce restructuring within the ITSM Governance team.

18. On March 18, 2025 – the same day Plaintiff received his termination notice – Plaintiff and Puckett independently confirmed via IBM's internal messaging system (Slack) that Prabhu was ineligible to perform Federal Change Advisory Board ("Federal CAB") responsibilities due to his India-based location, and that a second replacement worker would be required to cover U.S.-residency-required duties. IBM proceeded with Plaintiff's termination despite knowing its replacement plan was incomplete as of the date of the termination notice. See Exhibit P.

***The Location Strategy and Broader Context***

19. On April 10, 2025, IBM General Manager Alan Peacock announced a "Location Strategy" affecting IBM's Infrastructure Cloud division. This announcement identified the decisional unit for the group termination program that included Plaintiff's position. See Exhibit V.

20. IBM's pattern of replacing domestic workers with lower-paid workers, including workers based in India, is documented by both former IBM leadership and independent sources. In a public LinkedIn article dated December 31, 2024, titled "My Final Lap as an IBM Manager," Kevin Brooks – a retired IBM Program Director with nearly 40 years of service – described IBM's strategy as a "war on labor cost" using "Resource Actions" and "Relocate or Resign" and "Fire in the US ($$$) - Hire in India ($)." In the comments on the same article, Brooks further stated that IBM's Return to Office policy was "a poor disguise for shifting labor cost to lower cost countries." Independent reporting by The Register on March 27, 2025, documented an 11.6:1 India-to-U.S. hiring ratio at IBM during the relevant period. See Exhibit I.

21. Multiple independent sources – including CNBC, Bloomberg, and the website fired.fyi – have documented that between 13,000 and 17,000 or more IBM employees were affected by workforce reductions in the same time period, with a report from The Register dated November 4, 2025, indicating that 45-50% of U.S. groups in Infrastructure Cloud were targeted.

## COUNT ONE: RETALIATION

*(Title VII, 42 U.S.C. § 2000e-3(a); Equal Pay Act, 29 U.S.C. § 215(a)(3))*

**The conduct complained of involves: [X] termination of employment; [X] retaliation**

22. Plaintiff incorporates by reference all preceding paragraphs.

23. Plaintiff engaged in protected activity by raising pay equity concerns through his chain of command beginning in May 2024 and continuing through March 2025, including formal written requests submitted on November 8, 2024. See Exhibits D, K.

24. IBM took an adverse employment action against Plaintiff by terminating his employment on March 18, 2025.

25. There is a direct causal connection between Plaintiff's protected activity and his termination. Specifically:

    **a. Temporal proximity:** Plaintiff's pay equity campaign began in May 2024 and was ongoing and active at the time of his termination. Plaintiff's most recent pay equity interaction with his manager occurred on March 17, 2025 – the same day IBM processed Plaintiff's GDP profit-sharing payment – one day before his termination notice. On March 25, 2025, seven days after termination, the "Closing

the Loop" email formally denied Plaintiff's requests without explanation. See
Exhibits C, D, K.

**b. Leadership knowledge:** The March 25, 2025, "Closing the Loop" email
exchange demonstrates that Plaintiff's manager presented Plaintiff's pay equity
requests to IBM leadership, who denied the requests without explanation. This
establishes that Plaintiff's pay equity complaints had reached management levels
above Plaintiff's direct supervisor prior to the termination decision. See Exhibit
D.

**c. Pretext indicators:** IBM's stated reasons for Plaintiff's termination –
"Reduction in Force" and "Talent Footprint" – are contradicted by: (i) Plaintiff's
"thriving" performance evaluation dated February 10, 2025 (see Exhibit G); (ii)
IBM's processing of the GDP profit-sharing payment on March 17, 2025,
recognizing Plaintiff's contribution to IBM's business results (see Exhibit C); (iii)
Ahmad's statement to Marie Puckett on or about February 18, 2025, that he was
"adding to ITSM, not reducing," made in direct response to Puckett asking
whether she and Plaintiff should seek other employment after Prabhu was added
to their team (see Exhibit F); (iv) IBM's task-by-task transfer of Plaintiff's
specific ITSM Governance duties – including Change Approvals, Japan Tagging,
Emergency Changes, and Compliance Tagging – to replacement workers on April
4, 2025, as documented in IBM's own Monday.com project management system,
demonstrating that Plaintiff's position was not eliminated but transferred to
Prabhu (India-based) and Shyikh (see Exhibit N); (v) IBM's simultaneous
addition of at least three replacement workers – Prabhu, Shyikh, and Smriti – to
perform Plaintiff's functions, which is structurally inconsistent with a genuine
workforce reduction (see ¶16); and (vi) IBM's own internal "Cloud US Site List"
identifies Austin, Texas and Dallas, Texas as Strategic Key Locations, while
Denver, Colorado does not appear in any location category (see Exhibit U).
Plaintiff's ITSM Governance role was originally designated Dallas, Texas – a
Strategic Key Location – through IBM's Collabera contracting arrangement.
Upon converting Plaintiff to full-time employee in January 2022, IBM
reclassified his work location to Denver, Colorado, removing him from a
Strategic Key Location through IBM's own administrative action, without any
operational change to his role. IBM cited "Talent Footprint" to terminate Plaintiff
without ever offering him the opportunity to relocate to Dallas, Austin, or any
other Strategic Key Location. IBM subsequently filled Plaintiff's role with Zaid
Shyikh, whose IBM ServiceNow work location is Austin, Texas – 11501 Burnet
Road – a Strategic Key Location. IBM's own administrative action created the
location mismatch it subsequently cited as part of the "Talent Footprint"
justification, and IBM resolved that mismatch by placing a replacement worker in

a Strategic Key Location without ever offering Plaintiff the opportunity to relocate. See Exhibits S, U.

26. Defendant's termination of Plaintiff was substantially motivated by Plaintiff's exercise of his statutory right to raise pay equity concerns, in violation of Title VII § 704(a) and the Equal Pay Act § 15(a)(3).

### COUNT TWO: AGE DISCRIMINATION

*(Age Discrimination in Employment Act, 29 U.S.C. § 623)*

**The conduct complained of involves: [X] termination of employment; [X] different terms and conditions of employment**

**Defendant's conduct was discriminatory based on: [X] age**

27. Plaintiff incorporates by reference all preceding paragraphs.

28. Plaintiff was 42 years old at the time of his termination and is a member of the protected class under the ADEA (age 40 and over).

29. Plaintiff was qualified for his position, as demonstrated by his Bachelor's and Master's degrees in Information Technology Management, thirteen digital credentials (including three in Artificial Intelligence), "thriving" performance evaluation, GDP profit-sharing eligibility recognizing his contribution to IBM's business results, and approximate 99% Change success rate as documented in the sworn declaration of Marie Puckett. See Exhibits F, G, C.

30. IBM terminated Plaintiff's employment on March 18, 2025.

31. Upon information and belief, Plaintiff was replaced by workers under the age of 40, including Praveen Prabhu, who IBM's own internal directory identifies as located in Bangalore, India, reporting to IBM's India Software Labs organizational unit, and who is, upon information and belief, of Indian national origin. See Exhibit P.

32. IBM's termination of Plaintiff was part of a sequential pattern of age-based elimination within the ITSM Governance team of the Infrastructure Cloud division. Specifically:

a. By late 2023, the ITSM Governance team's remaining members were all over the age of 40: Michael Gardner (over age 50), Plaintiff (age 41), and Marie Puckett (age 63). b. Michael Gardner was the first to be separated, departing in October 2024 under IBM's "Business Driven Mobility" program. Plaintiff was terminated in March 2025 (last day April 17, 2025) under a "Reduction in Force" and "Talent Footprint" justification. Marie Puckett was terminated in approximately November 2025 (last day on or about December 4, 2025). By December 2025, 100% of the remaining over-40 workers had been eliminated. c. Upon information and belief, 100% of replacement workers were under age 40. d. The eliminated positions were held by the highest-compensated workers in the

unit, whose higher salaries correlated directly with their age and years of experience. IBM replaced these workers with lower-paid workers, using salary as a proxy for age in violation of the principle established in *Hazen Paper Co. v. Biggins,* 507 U.S. 604 (1993).

33. On March 14, 2025, IBM announced the assignment of Smriti – who, upon information and belief, is under age 40 – as an AIOps architect focusing on Change Management automation & reporting, a role directly overlapping Plaintiff's ITSM Change Management responsibilities. General Manager Satinder Sethi was copied on this announcement. On March 25, 2025, Plaintiff emailed Sethi describing his AI qualifications for such opportunities. Sethi – the same General Manager who was copied on Smriti's assignment announcement eleven days earlier and whose strategic priorities were cited as the basis for that assignment – did not respond to Plaintiff's communication, which is consistent with executive-level awareness of the age-based selection pattern. See Exhibit J.

34. IBM's conduct was willful within the meaning of 29 U.S.C. § 626(b), entitling Plaintiff to liquidated damages. IBM's conduct must be evaluated in light of the EEOC's August 2020 determination, based on a nationwide investigation, that IBM's layoff practices from 2013 to 2018 had an adverse impact on older workers, with more than 85% of employees targeted for layoff being over the age of 40, and that the EEOC had "uncovered top-down messaging from IBM's highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers.

## COUNT THREE: VIOLATION OF THE OLDER WORKERS BENEFIT PROTECTION ACT

*(29 U.S.C. § 626(f))*

**The conduct complained of involves: [X] other: Failure to provide mandatory OWBPA disclosures; willful misrepresentation of statutory requirements; inadequate consideration period**

**Defendant's conduct was discriminatory based on: [X] age**

35. Plaintiff incorporates by reference all preceding paragraphs.

36. IBM's termination of Plaintiff occurred as part of an "exit incentive or other employment termination program offered to a group or class of employees" within the meaning of 29 U.S.C. § 626(f)(1)(H). The decisional unit was IBM's Infrastructure Cloud division, as identified by GM Alan Peacock's April 10, 2025, Location Strategy announcement. The program affected multiple employees across the division. See Exhibit V.

37. IBM offered Plaintiff a Separation Agreement that restricted Plaintiff's rights under the ADEA. Specifically, while the Agreement carved ADEA claims out of the general release of claims (Section 3), it required that all ADEA claims be submitted to

mandatory, individual, binding arbitration (Section 5), thereby waiving Plaintiff's right to pursue ADEA claims in court, his right to a jury trial on ADEA claims, and his right to participate in any class or collective action involving ADEA claims. These restrictions on ADEA rights, offered in exchange for severance consideration, constitute a waiver of rights under the ADEA within the meaning of 29 U.S.C. § 626(f). See Exhibit M.

38. Under 29 U.S.C. § 626(f)(1)(H), when an employer requests a waiver of ADEA rights in connection with a group termination program, the employer must provide each employee with: (i) the class, unit, or group of individuals covered by the program; (ii) the eligibility factors for the program; (iii) the job titles and ages of all individuals selected for the program; and (iv) the ages of all individuals in the same job classification or organizational unit who were not selected for the program.

39. IBM failed to provide these mandatory disclosures. On April 17, 2025, Plaintiff requested the decisional unit disclosure data. IBM's Workforce Management Process Office ("WFMPO") responded on April 20, 2025, refusing to provide the information and asserting "IBM does not provide the information you are requesting as part of its resource action process, and there is no requirement to do so." On April 21, 2025, Plaintiff submitted a second written request clarifying his specific statutory right under the OWBPA. On April 22, 2025, WFMPO again refused, and further asserted that the Separation Agreement "does not include a waiver of claims under the ADEA" – a misrepresentation of the Agreement's **actual** terms, as the Agreement's mandatory arbitration clause (Section 5) effectively waives Plaintiff's right to a judicial forum for ADEA claims. See Exhibit E.

40. Under 29 U.S.C. § 626(f)(1)(F)(i), for individual waivers requested in connection with a group termination program, the employer must provide at least 45 days for the employee to consider the agreement. IBM provided only 30 days, as stated in the Separation Agreement itself. This is an additional failure to comply with OWBPA requirements. See Exhibit M.

41. Plaintiff did not sign the Separation Agreement. Plaintiff forfeited $37,250 in severance pay to preserve his statutory rights.

42. Under the Supreme Court's holding in *Oubre v. Entergy Operations, Inc.,* 522 U.S. 422 (1998), IBM's failure to comply strictly with the requirements of the OWBPA renders any waiver of ADEA claims in the Separation Agreement void and unenforceable as a matter of law.

43. IBM's non-compliance was willful, as demonstrated by the WFMPO's written assertion of a false legal position regarding a specific federal statute in documented correspondence, reflecting reckless disregard for the requirements of the ADEA and OWBPA.

## <u>COUNT FOUR: EQUAL PAY ACT VIOLATION</u>

*(29 U.S.C. § 206(d))*

**The conduct complained of involves: [X] different terms and conditions of employment**

**Defendant's conduct was discriminatory based on: [X] sex**

44. Plaintiff incorporates by reference all preceding paragraphs.

45. Plaintiff, a male employee, was classified at IBM Band 8. Marie Puckett, a female employee and Plaintiff's functional supervisor on the ITSM Governance team, was classified at IBM Band 9 and compensated at a higher rate.

46. Plaintiff and Marie Puckett together performed all ITSM Governance functions for IBM's Infrastructure Cloud division, splitting responsibilities between them as the only two remaining team members. Both roles required substantially equal skill, effort, and responsibility in ITSM process governance, and were performed under similar working conditions within the same division. By 2025, Plaintiff reported to manager Josh Miller, and Puckett reported to manager Ahmad.

47. Despite performing substantially equal work – and holding equal or superior academic credentials, including a Bachelor's and Master's degree compared to, upon information and belief, Puckett's Associate's degree – Plaintiff was classified one band level below Puckett and was compensated at a lower rate, with the disparity favoring the female comparator.

48. IBM's pay differential was not justified by any of the affirmative defenses available under the EPA (seniority system, merit system, quantity/quality of production, or factor other than sex). IBM's pay practices during this period were inconsistent with its own internal compensation policies, including Corporate Policy 117, which requires that compensation decisions be made without regard to sex and other protected characteristics. See Exhibit C.

49. IBM's violation of the EPA was willful, as demonstrated by its concurrent violation of its own internal compensation policies during the same period in which the pay disparity existed. Under *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111 (1985), willfulness is established when the employer knew or showed reckless disregard for whether its conduct was prohibited. IBM's failure to follow its own policies designed to ensure pay equity demonstrates such reckless disregard, entitling Plaintiff to liquidated damages.

50. Plaintiff's pay equity complaints, which constitute protected activity under the EPA, were a substantial motivating factor in IBM's decision to terminate Plaintiff, as alleged in Count One.

## COUNT FIVE: NATIONAL ORIGIN DISCRIMINATION

*(Title VII, 42 U.S.C. § 2000e-2(a))*

**The conduct complained of involves: [X] termination of employment; [X] different terms and conditions of employment**

**Defendant's conduct was discriminatory based on: [X] national origin**

51. Plaintiff incorporates by reference all preceding paragraphs.

52. Plaintiff is a U.S.-born American citizen of Hispanic-American heritage and is of U.S. national origin, a member of a protected class under Title VII. The primary replacement worker for Plaintiff's position, Praveen Prabhu, is, upon information and belief, of Indian national origin, as supported by IBM's own internal systems identifying him as located in Bangalore, India, under IBM's India Software Labs organizational unit, with an India country phone code (+91). See Exhibit P.

53. Plaintiff was qualified for his position, as set forth in the facts common to all claims.

54. IBM terminated Plaintiff's employment on March 18, 2025, and distributed his job duties among Praveen Prabhu – who IBM's own internal systems identify as located in Bangalore, India, reporting to IBM's India Software Labs organizational unit, and who is, upon information and belief, of Indian national origin – Zaid Shyikh, who is based in Austin, Texas (United States), and to a certain degree Smriti for reporting and analytics functions. IBM's deliberate structuring of this replacement – retaining an India-based worker of Indian national origin (Prabhu) for the bulk of ITSM Governance functions while adding a U.S.-based worker (Shyikh) only for those duties requiring U.S. residency – demonstrates that IBM consciously maximized offshoring of Plaintiff's responsibilities while retaining the minimum domestic presence legally or operationally required. On March 18, 2025, the same day Plaintiff received his termination notice, both Plaintiff and Puckett independently confirmed that Prabhu was ineligible to perform Federal CAB responsibilities due to his India-based location, requiring IBM to add a second replacement worker (Shyikh) specifically for those duties. IBM proceeded with Plaintiff's termination despite knowing its replacement plan was incomplete. See Exhibit P.

55. The replacement of Plaintiff – an American worker of U.S. national origin – with workers including a worker of Indian national origin was part of a systematic pattern within IBM. In a public LinkedIn article dated December 31, 2024, titled "My Final Lap as an IBM Manager," Kevin Brooks – a retired IBM Program Director with nearly 40 years of service – described IBM's strategy as a "war on labor cost" employing the formula "Fire in the US ($$$) - Hire in India ($)." Brooks further confirmed in public comments that IBM's Return to Office mandate was "a poor disguise for shifting labor cost to lower cost countries." Independent reporting by The Register documented an 11.6:1 India-to-U.S. hiring ratio at IBM during the relevant period. See Exhibit I.

56. Following Plaintiff's termination notice, IBM's Monday.com system records show the creation of a "Combined CAB – India" board on April 4, 2025, with Praveen Prabhu designated as owner – the same date IBM transferred Plaintiff's Change Approvals and other ITSM tasks to Prabhu in IBM's own project management system. See Exhibit N. By April 10, 2025, Prabhu confirmed to Plaintiff via IBM's internal messaging that "today's CAB India went well," establishing that the India CAB was operational and under Prabhu's leadership during Plaintiff's final working days. See Exhibit N. This systematic transfer of Plaintiff's responsibilities to a worker of Indian national origin further demonstrates IBM's deliberate program to replace American workers of U.S. national origin with workers of Indian national origin.

57. IBM's pattern of replacing American workers of U.S. national origin with workers of Indian national origin constitutes discrimination on the basis of national origin in violation of Title VII.

## E. ADMINISTRATIVE PROCEDURES

**[X] Yes** – Plaintiff filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission. EEOC Charge No. 541-2025-02478. *A copy of the EEOC Charge is attached as Exhibit A.*

**[X] Yes** – Plaintiff has received a Notice of Right to Sue from the EEOC. *A copy of the Notice of Right to Sue is attached as Exhibit B.*

The EEOC issued its Determination and Notice of Rights on December 2, 2025, but Plaintiff did not receive the notice until December 11, 2025, due to technical issues with the EEOC's Public Portal that prevented access to the document. This action is timely filed within 90 days of Plaintiff's actual receipt of the Notice of Rights.

**Note regarding Count Four (EPA):** The Equal Pay Act does not require exhaustion of administrative remedies. Plaintiff's EPA claim is filed directly under 29 U.S.C. § 206(d) and is not dependent on the EEOC Right-to-Sue letter. The EPA provides a two-year statute of limitations (three years for willful violations).

## F. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

**1. Declare** that Defendant's actions as described herein violated Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, and the Equal Pay Act;

**2. Award back pay** in an amount to be determined at trial, representing wages and benefits lost from the date of termination to the date of judgment, including the $37,250 in severance pay Plaintiff was compelled to forfeit to preserve his statutory rights;

**3. Award front pay** in an amount to be determined at trial, representing future lost wages and benefits resulting from Defendant's unlawful conduct;

**4. Award compensatory damages** for emotional distress, humiliation, and reputational harm caused by Defendant's discriminatory and retaliatory conduct;

**5. Award liquidated damages** in an amount equal to back pay for Defendant's willful violations of the ADEA and the Equal Pay Act, pursuant to 29 U.S.C. § 626(b) and 29 U.S.C. § 216(b);

**6. Award punitive damages** for Defendant's malicious and reckless conduct in violation of Title VII;

**7. Award pre-judgment and post-judgment interest** as allowed by law;

**8. Enjoin** Defendant from continuing to engage in the discriminatory and retaliatory practices described herein;

**9. Award reasonable attorneys' fees and costs** to the extent permitted by law; and

**10. Grant such other and further relief** as this Court deems just and proper.

## G. PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. See 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Stephen P. Gutierrez, Plaintiff (*Pro Se*)

Date: 03-05-26

### *EXHIBITS*

**Exhibit A:** EEOC Charge of Discrimination (No. 541-2025-02478)

**Exhibit B:** EEOC Notice of Right to Sue

**Exhibit C:** GDP Profit-sharing payment notification (March 17, 2025), including IBM Corporate Policy 117 reference

**Exhibit D:** "Closing the Loop" email exchange (March 25, 2025)

**Exhibit E:** OWBPA disclosure refusals (April 20 & 22, 2025)

**Exhibit F:** Sworn Declaration of Marie Puckett (2025)

**Exhibit G:** Performance evaluation – "thriving" (February 10, 2025)

**Exhibit I:** Kevin Brooks LinkedIn article, "My Final Lap as an IBM Manager" (December 31, 2024), with comments

**Exhibit J:** "Assignment Update – Smriti" email from Girish Dhanakshirur (March 14, 2025), CC: Satinder Sethi, Mr. Ahmad

**Exhibit K:** Pay equity correspondence timeline (May 30, 2024 – March 25, 2025)

**Exhibit L:** IBM "Your Roles" system – three concurrent role assignments

**Exhibit M:** IBM Separation Agreement, relevant sections (Sections 3 and 5; consideration period)

**Exhibit N:** IBM Monday.com ITSM Governance Work board – task ownership and transfer records (March 25 – April 10, 2025): Part 1, board snapshot (March 25, 2025); Part 2, activity log (April 4, 2025); Part 3, India CAB creation log and messaging (April 4–10, 2025)

**Exhibit P:** IBM internal directory, Slack records, and government access documentation – Praveen Prabhu profile, onboarding, and Federal CAB ineligibility (February–April 2025)

**Exhibit S:** IBM ServiceNow user profile and Slack records – Zaid Shyikh role and team assignments (March 14–21, 2025)

**Exhibit U:** IBM Cloud US Site List – location classifications by strategic category

**Exhibit V:** Alan Peacock "Announcement: Cloud Location Strategy" email (April 10, 2025)